ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN MARIANA ISLANDS

1
2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL CASE NO. 04-00038 |
| | ) | |
| Plaintiff, | ) | Garapan, Saipan |
| | ) | Friday, August 5, 2005 |
| vs. | ) | |
| | ) | |
| ERIC JOHN TUDELA MAFNAS and, | ) | **REPORTER'S PARTIAL TRANSCRIPT OF** |
| CHARLEY K. PATRIS, | ) | **WITNESS JOSEPH AUTHER'S TESTIMONY** |
| | ) | |
| Defendants. | ) | |
| | ) | |

F I L E D
Clerk
District Court

AUG -- 8 2005

For The Northern Mariana Islands
By_____
(Deputy Clerk)

BEFORE THE HONORABLE A. WALLACE TOSHIMA
SENIOR CIRCUIT JUDGE, UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT, PRESIDING IN A JURY TRIAL
IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

<u>**APPEARANCES**</u>:

For Plaintiff:        Timothy Moran & Jamie D. Bowers
                      Assistant United States Attorneys
                      MARIANAS DISTRICT
                      Horiguchi Building, Third Floor
                      P. O. Box 500377
                      Saipan, MP 96950
                      Telephone: (670) 236-2986
                      Facsimile: (670) 236-2945

For Defendant         Stephanie Flores & Victorino Torres
  Mr. E.J.T. Mafnas:   Attorneys at Law
                      Torres Brothers P.C.
                      P. O. Box 501856
                      Saipan, MP 96950
                      Telephone: (670) 233-5506
                      Facsimile: (670) 233-5510

# I N D E X

**PLAINTIFF'S WITNESS**          **DIRECT**          **CROSS**

**AUTHER,** Joseph

    Mr. Moran..........3

---

# E X H I B I T S

**PAGE**

PLAINTIFF'S EXHIBITS                                    OFFERED      RECEIVED

6A  - Complaint Report, Case No. 02-011523......................Previously.......20
7A  - Complaint Report, Case No. 02-010450......................Previously.......20
8A  - Complaint Report, Case No. 02-010450......................Previously.......20

i

2

1    For Defendant
2        Mr. C.K. Patris:        Perry Inos
                                 Attorney at Law
3                                P. O. Box 502017
                                 Saipan, MP 96950
4                                Telephone: (670) 235-9006
                                 Facsimile: (670) 235-9007
5
6    Also Present:              Defendants Mafnas & Patris
                                Joseph Auther, Special Agent, FBI, case agent &
7                               Eric Gregoire, Computer Technical Assistant,
                                U.S. Attorney's Office
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

**GARAPAN, SAIPAN, FRIDAY, AUGUST 5, 2005 – 1:30 P.M.**

1

2   (This partial transcript of witness Joseph Auther's testimony on

3   direct examination begins as follows:)

4                          **DIRECT EXAMINATION**

5   **BY MR. MORAN:**

6

7   Q    Okay, and there's another call with a dot next to it further

8   down the page.  Can you see that one?

9   A    Yes, I can.

10  Q    Explain what that call is.

11  A    That's a phone call from the K.P Company phone to Detective

12  Mafnas that was made on 5/13/2003, so May 13, 2003 at 8:31:18, so

13  8:31 a.m.  And that call was for a duration of 33 seconds.

14

15  Q    What happened on May 13, 2003 that's relevant to this case?

16  A    That was the day that Detective Mafnas checked the Chizua ice

17  out of the evidence room.

18            MR. MORAN: If I might have a moment?

19            THE COURT: Yes.

20

21  Q    BY MR. MORAN: Let me get that exhibit out of your way.  Now,

22  Agent Auther, we're now going to move from the drug part of this case

23  to the next part of the case so to speak.  Now you mentioned that you

24  spoke to the defendants about this case.

25

    A    Yes, I did.

4

Q    When was that?

A    It was on December 22, 2003.

Q    What else happened that day?

A    That was the day that the search warrant was being executed on the DPS evidence room.

Q    And where did you speak to the defendants?

A    In the Captain's Office of the Criminal Investigation Bureau, which is the police headquarters building in Susupe.

Q    Were they defendants then?

A    I'm sorry?

Q    Were they defendants then?

A    Were they --

Q    Had they been indicted yet in this case?

A    No, they had not.

Q    Who else was present when you spoke to them?

A    Another FBI Agent Daina McMahon.

Q    Did you speak to them individually or together?

A    I spoke to them one at a time.

Q    Who did you speak with first?  Do you recall?

A    Uh, I don't recall.

Q    Let's start with defendant Patris.  Did you tell him what you wanted to talk about?

5

A    Yes, I did.

Q    What did you say about that?

A    I told him that we were executing a search warrant, cause I --
the search was going on simultaneously with the interview.  So some
agents were all doing a search while myself and another agent were
interviewing the defendants.  But I explained to Detective Patris
that there was an investigation into some missing drug evidence and
we had heard that he might have some information regarding it.

Q    Did you tell him what drug evidence you were looking for?

A    Uh, I, I don't know that I -- I believe I told him it had to do
with the Manabu Chizuwa case, yes.

Q    So what did you ask him?

A    So I asked him if he had any idea what happened to the drugs
from the Manabu Chizuwa case.

Q    And what did he say?

A    He told me that he witnessed Detective Mafnas burn the ice in a
drum barrel, 55-gallon barrel at the SIS Offices on Capitol Hill.

Q    What was your reaction to that?  What did you --

A    I told him that that didn't sound right, that it sounded
ridiculous.  And I tried to explain to him that in my experience as
an FBI agent, if you're going to destroy drugs, or if you're going to
destroy any evidence, you usually don't do it before the suspect is

6

even pled -- is even sentenced; and you don't destroy something like

drugs by burning them in a trash can; and that you don't do it

without documenting what you did through either some photographs or a

written report or some kind of basis or explanation, for the

destruction, indicating some evidence that it was destroyed; and that

I really found it to be -- I think my words were, I think I told him

several times, "Your story is ridiculous and I don't believe that you

burned those drugs because you would not, as an experienced officer,

you would not destroy evidence in a drug investigation before the

defendant had even been sentenced, and that he still had an

opportunity to appeal his conviction."

Q     And you told him that it was ridiculous, that you found this

very ridiculous and you didn't believe him.  What did he say in

response?

A     He reiterated that he had witnessed Detective Mafnas burn the

drugs.  And I asked him, "What did they look like?  How do you know

that the drugs that Detective Mafnas burned were the drugs from the

Chizuwa case?"

Q     Did he tell you how he knew that they were the Chizuwa drugs?

A     Yes, he did.

Q     What did he say?

A     He said that he recognized the packaging.  And I said, "What do

7

you mean you recognize the packaging?" He said that he observed that
the drugs that were burned in the trash barrel were identical to the
drugs and the way they were packaged on the date that he took part in
the search and seizure of that drug evidence from Chizuwa's vehicle.

Q     These were the Chizuwa's ice that he was there when the
Chizuwa's ice was seized, that it was, it looked the same when the
defendant Mafnas burned it as it looked when it was seized.

A     And that's how he knew it was the same drugs.

Q     Did he say whether or not he saw the ice being lit on fire?

A     I don't know if he said he saw when it got lit, but he said he
saw it burning and being put into the trash can.

Q     But he said he saw it being put into the trash can.

A     Yes.

Q     Did he say, did he say why they did it?

A     He said that they were given or told by a former Assistant
Attorney General Don Wolfe to destroy the ice.

Q     Did he say when Assistant Attorney General Wolfe had told him to
do that?

A     He couldn't remember the date, but he told me he knew sometime
earlier than 2003, and that to his recollection it was in a context
of a meeting that he and Detective Mafnas had with Mr. Wolfe in Mr.
Wolfe's office where there was a conversation about the Chizuwa plea

Agreement.

Q    Did he say he was also present for that conversation?

A    He said it was just Eric and Mr. Wolfe.

Q    Did he say whether David Hutton was present for that conversation?

A    No, he did not.

Q    So he did not say that David Hutton was present.

A    That's correct.

Q    Did he say anything else about that conversation with Don Wolfe?

A    He told me that following this discussion about the Chizuwa plea agreement, there was some discussion, as I recall, about whether that was a fair plea agreement, that maybe they should have been more aggressive and taken Mr. Chizuwa to trial on a distribution count instead of just possession.  So there was some discussion about that. He told me that following that, the discussion turned to what to do with the evidence, that the topic of destroying, that the Assistant Attorney General Mr. Wolfe told them, "destroy the drugs," and he gave them -- Assistant Attorney General Wolfe gave them a letter authorizing the destruction of the drugs.

Q    Did he say whether he'd seen the letter?

A    Yes, he did.

Q    And had he?

9

A    He did, he told me he saw the letter.

Q    This is during a conversation with, between the defendants

Mafnas and Patris and just Don Wolfe that they discussed the plea

agreement, and during that conversation, Wolfe told them to destroy

the ice.

A    Correct.

Q    And that's when, according to defendant Patris, Wolfe gave them

a letter authorizing the destruction of the ice.

A    Correct.

Q    And what did he say that they did with that letter?

A    He said they took that letter over to the DPS evidence room and

gave it to Johannes Taimanao.

Q    So immediately following the conversation that they said they

took, that Patris said they took the letter to Johannes Taimanao.

A    Yes.

Q    And what was your reaction to all of this about Don Wolfe?   What

did you tell the defendant Patris?

A    I told him I talked to Don Wolfe and Don Wolfe said there

wasn't, that he would never authorize anyone to destroy the Chizuwa

ice.  He had never authorized anyone to destroy anything.

        MS. FLORES: Objection, Your Honor.  Don Wolfe's statement

would be hearsay.  Don Wolfe had already testified previously, that

the jury will remember what Don Wolfe had testified to.

MR. MORAN: Your Honor, he's --

THE COURT: No, --

MR. MORAN: He's recounting a statement that he made to the defendant Patris.

THE COURT: The objection is overruled. This statement is admitted only for the purpose of explaining the context in which a further statement may have been made by the defendant Patris in reaction to what this witness said that he was told by Don Wolfe. And it's not admitted to prove the truth of the statement made.

Go ahead and finish your statement.

THE WITNESS: So I told, I told Detective Patris --

Q    BY MR. MORAN: I'm sorry. You were going to tell, tell us what you told the defendant Patris.

A    Yes, I told Detective Patris that I spoke with Don Wolfe and Don Wolfe told me he never authorized the destruction of the Chizuwa ice.

Q    And what was the defendant's response to that?

A    He continued to maintain that he had seen a letter authorizing the destruction of the drugs. And during the course of the interview, I even told him that, "If there was just some administrative mess up where you checked out the drugs to take it to court and you lost it or something like that happened, the FBI is not

going to put you in jail.  But if you continue to say that you

destroyed it and it turns out you didn't destroy it, you know, it

could be a federal offense.  And if you want to change your story or

think about this, if it was just a mess up on your part or Eric's

part, tell me because then it might just be an administrative

problem.  You might be suspended, but you're probably not going to go

to jail." But he continued to say that, "I witnessed Detective Mafnas

put the ice in a trash can and burn it."

Q    Now you also interviewed Detective Mafnas; is that correct?

A    Yes, I did.

Q    On the same day?

A    Yes.

Q    Who was present when you interviewed the defendant Mafnas?

A    Just FBI Agent Daina McMahon.

Q    And what happened during that conversation?  What did you say

to, to the defendant Mafnas?

A    The two interviews were very similar.  I started out explaining

to Detective Mafnas that, "We're here to investigate some missing

drug evidence from the Manabu Chizuwa case." We started out talking

about, was he familiar with that case, was he familiar with the

drugs.  He told me he knew about the case.  He was, you know, had

worked on it.  He told me that there had been a discussion about the

12

plea arrangement (sic) with Assistant Attorney General Wolfe, and
after that discussion, he got a letter authorizing the destruction of
the ice.  He --

Q    So he said that Assistant Attorney General Wolfe discussed
destroying the ice during the same discussion in which they all
discussed the plea agreement.

A    Yes.

Q    Who did he say was present for the discussion of the plea
agreement?

A    Uh, just Detective Patris.

Q    And Don Wolfe.

A    And Don Wolfe.

Q    And they got the letter from Don Wolfe, he said, during that
conversation.

A    Yes.

Q    And what did he say they did with that letter?

A    He said he took the letter to the evidence custodian Johannes
Taimanao.

Q    Straight to, straight to Johannes Taimanao.

A    Uh, yeah, I think he -- I don't remember if he told me he took
it right then or if he took it there the next day.  I think he took
it there right after the meeting.  I'd have to refresh my memory from

13

1    my report.

2    Q    Would you like to see your, that --

3    A    Sure.  Okay.

4    Q    Is your memory refreshed?

5    A    Yes.

7    Q    Okay, let me take that back.  So what did he do with the -- what

8    did he say that he did with the letter?

9    A    He said that he could not remember if he took the letter that

10   day or the following day, but that he did take the letter to Johannes

11   Taimanao to acquire the drugs.

13   Q    So he said he took the letter authorizing the destruction of

14   drugs to Johannes Taimanao either the same day as the discussion of

15   the plea agreement or the next day.

16   A    Correct.

17   Q    What did he say happened to the drugs.

19   A    He said he took the drugs up to his office on Capitol Hill.  He

20   placed them in a file cabinet where they remained, he thinks, until

21   the following day.

22   Q    And then what did he say that he did with the drugs?

23   A    He said the next day he took the drugs from the file cabinet and

24   got Detective Patris, told him he was going to go burn them in a

25   trash can, and he went outside and placed them in a big 55-gallon

14

metal drum can with trash in it, placed them in there, lit the

rubbish -- papers and what not that were in the trash can -- on fire

and burned the ice.

Q    Did he say whether he showed the drugs to the defendant Patris?

A    Uh, he said he -- again, I don't remember if he, I mean, he told

me that he got Detective Patris to witness the burning of them.   So

he --

Q    But he said that --

A    -- had to show it to him.

Q    -- that Patris saw him burn the drugs.

A    Correct.

Q    What did you say to the defendant about the story when you were

interviewing him?

A    I told Detective Mafnas the same thing I told Detective Patris

that, "You guys are veteran police officers.   You know you're not

going to destroy drugs in a criminal case where the defendant had

just pled guilty and haven't even been sentenced.   You know from your

experience he can appeal those convictions, that conviction.   And no

attorney general is going to authorize you to destroy the evidence."

And I asked him, "Have you ever destroyed drug evidence before?" And

he said, "No."   I said, "All of a sudden, now you decide you're going

to destroy drug evidence for the first time in your history of being

15

a police officer?" And he just --

Q    What did he say in response?

A    He just said, "yeah, I was told to destroy them so I destroyed them."

Q    Did you ask him about DPS policy about destroying evidence?

A    Yes.

Q    What did he say in response to that?

A    He said he was not aware of any policy.

Q    Did you explain to him that you were investigating the disappearance of those drugs for the FBI?

A    Yes.

Q    What did you say about that?

A    I told him -- again, it was very similar to my discussion with Detective Patris. I said, "Lying to an FBI agent is a federal crime. You don't need to do this. If you just messed up, if you lost the drugs, if there's an innocent explanation for this and you're embarrassed or you're afraid of being punished or suspended, it's a lot better than turning this into a major federal criminal case where you could go to jail. So just tell me now what happened to those drugs, and you're probably not going to be in as big a trouble as if you continue to lie to me, and if we find out that those drugs were not burned."

16

Q    And what did he say in response?

A    He continued, he was adamant.  "I had permission to destroy those drugs, and I took them to the Capitol Hill Office and put them in a trash can and burned them."

          MR. MORAN: If I might have one moment, Your Honor?

          THE COURT: Yes.

Q    BY MR. MORAN: Agent Auther, when did this investigation first start at the Attorney General's Office?

A    My understanding -- they called me on -- well, the search warrant was served December 22, 2003.  So I got involved, they called me probably December 20th.  I know we met maybe once or twice and then executed the search warrant.  But I think they were working on it for maybe several days prior to even calling me.

Q    So how much time had passed when it was first known that the drugs were missing and your interview with the defendants?

A    I, I'd estimate about one week.

          MR. MORAN: I've nothing further with this witness right now, Your Honor, but we do intend to recall him later in the trial.

          THE COURT: I understand.  It's about five minutes to 3:00 so we might as well -- we'll take our afternoon recess before we get on with further examination of this witness.  So the jury is now excused for the afternoon recess.

17

1    Agent Auther, stay in the witness box because we're going

2    to take up these exhibits.

3        (Jury excused.)

4        You may be seated.  The only matter I want to take up is I

5    reserved ruling on, I think, three exhibits that government offered,

6    right?  I think they were 6A, 7A, and 8A.  What's your argument on

7

8    that?  Let's hear -- Mr. Moran, let's hear from you first.

9        MR. MORAN: Your Honor, pursuant to Rule 803, these are

10   admissible both as public records and as business records.

11

12       THE COURT: Where did they come from now?

13       MR. MORAN: They're generated by DPS.  The witness testified

14   that they're generated in the normal course of business immediately

15   after the event that they're -- and they're normally maintained in

16   the regular course of business.

17

18       THE COURT: No, no, no.  But, Agent Auther, what did you do?

19   You went over to the DPS to get them; is that what happened?

20       THE WITNESS: Correct.

21       THE COURT: All right.  So you're offering them as public

22   records?

23       MR. MORAN: Or as business records, Your Honor.

24       THE COURT: All right.  What's your objection?

25       MS. FLORES: Your Honor, in order for it to come in as a

18

business record, we would have to have somebody testify that they

work at DPS, that it's maintained in their regular course of

business, not for Mr. Auther to --

THE COURT: What about --

MS. FLORES: -- to say what the regular course --

THE COURT: What about --

MS. FLORES: -- of business is.

THE COURT: What about a public record?

MS. FLORES: Well, Your Honor, there's a specific except --

these are records maintained by a law enforcement organization, and

there's a specific exception under Rule 803(8) as to, in criminal

matters, uh, matters observed by police officers are not, are not

allowed to come in under public records.  And so that's what this

complaint, report would be, as matters observed by police officers.

MR. MORAN: Your Honor, the exception that Ms. Flores is

referring to in 803(6) refers, it goes to police reports.  Those are

matters that are observations.  This is merely an administrative

number, a recording of the case number.  This is an administrative

record.  The police department does, as a business or as any other

agency does, maintain administrative records.  And those can be

qualified as business records.  In addition, there's no requirement

under the rule that the person who created the record has to qualify

19

them.  It's sufficient so long as a witness can testify that they
were created in the normal course of business and were maintained in
that way.  And since Mr. Auther was present when they were printed
out, he can certainly testify as to the manner in which they were
maintained.

      MS. FLORES: Your Honor, I --

      THE COURT: No, no, no.  But that's different than being
there when it's pulled out of the file cabinet, right?  I don't think
that's --

      MR. MORAN: Basically if it's printed out, it's the same as
pulling it out yourself.

      THE COURT: But anyway, what else?

      MS. FLORES: I disagree, Your Honor.  I believe that in
order -- I'm not saying that the person that actually generated this
has to be here, but at least a custodian of records from DPS would
have to come and say that, "yes, this is the type of record that we
maintain in the ordinary course of our business." And for it to be a
business record, it should come in that way.

      THE COURT: All right.  I'm going to overrule the objection.
I'm going to admit Exhibits 6A, 7A, and 8A as public records.  I
agree with Mr. Moran that these are really administrative matters.
They're not like, you know, the 302 police reports where there's a

narrative of what happened and who said what and who did what; but

they're just administrative reports of regularly conducted

activities.  So on that basis, I admit 6A, 7A, and 8A.  All right?

        **(Government's Exhibits 6A, 7A, and 8A received.)**

                MR. FLORES: Thank you, Your Honor.

                THE COURT: Anything else to take up?

                MS. FLORES: Yes, Your Honor.

                THE COURT: Yes?

                MS. FLORES: Yes.

                THE COURT: Go ahead.  You may step down, Agent Auther.

                MS. FLORES: We understand that they're not going to ask

Agent Auther any further questions at this time.  However, this

witness does have further testimony that he'll be, he will be

providing throughout the trial.

                THE COURT: That's what Mr. Moran --

                MS. FLORES: We would request that his entire --

                THE COURT: That's what Mr. Moran said.

                MS. FLORES: -- testimony be --

                THE COURT: You request what?

                MS. FLORES: We request that he complete his entire

testimony that he's going to give.

                THE COURT: What's the reason for that?

21

MS. FLORES: To have him testify to his testimony?

THE COURT: Yeah.

MS. FLORES: We would request that if he's going to be testifying once that he sit up there and testify completely, and then we get a chance to cross-examine him just one time.

THE COURT: Well, you'll get a chance to cross-examine him two times. I don't understand the reason for the request. So it doesn't make too much sense to me, so it's overruled. I think, you know, either side should be allowed to present their evidence in the, in the order they think is --

MS. FLORES: Okay, that's fine then, Your Honor.

THE COURT: -- is best for them.

MS. FLORES: That's fine, Your Honor.

THE COURT: All right, anything else?

MR. MORAN: Not from the government, Your Honor.

MS. FLORES: No.

MR. INOS: No.

THE COURT: All right, let's take the remainder of our recess.


(Court recessed at 3:00 p.m., Friday, August 5, 2005.)

------------------------------------------------------------------

COMMONWEALTH OF THE )
NORTHERN MARIANA ISLANDS )   ss.
SAIPAN, MP )
_____ )

I, SANAE N. SHMULL, Official Court Reporter for the United States District Court for the Northern Mariana Islands, do hereby certify:

That the foregoing partial transcript of witness FBI Special Agent Joseph Auther's trial testimony in Criminal Case No. 04-00038, *United States of America v. Eric John Tudela Mafnas and Charley K. Patris*, consisting of 21 pages plus 1-index page, was taken down by me stenographically with a back-up tape recording device at the time and place indicated herein.

That the foregoing expedited transcript is a true and correct record of the proceeding transcribed by me to the best of my ability at the request of Assistant United States Attorney Timothy Moran.

I further certify that I am not interested in the events of the action.

IN WITNESS WHEREOF, I have subscribed my name and signature this 6th day of August 2005.

_____
SANAE N. SHMULL
Official Court Reporter