F I L E D
Clerk
District Court

FEB ~ 7 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

1  LEONARDO M. RAPADAS
   United States Attorney
2  TIMOTHY E. MORAN
   JAMIE D. BOWERS
3  Assistant U.S. Attorneys
   DISTRICT OF THE NORTHERN
4     MARIANA ISLANDS
   Horiguchi Building, Third Floor
5  P.O. Box 500377
   Saipan, MP  96950
6  Telephone:  (670) 236-2982
   Fax:          (670) 236-2985
7

8  Attorneys for the United States of America

9

10                    UNITED STATES DISTRICT COURT

11                    NORTHERN MARIANA ISLANDS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. <u>04-00038</u> |
| | ) | |
| Plaintiff, | ) | GOVERNMENT'S MEMORANDUM |
| | ) | REGARDING SENTENCING |
| v. | ) | |
| | ) | Date:  February 13, 2006 |
| ERIC JOHN TUDELA MAFNAS, | ) | Time:  9:00 a.m. |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

19       COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel,

20  Leonardo M. Rapadas, United States Attorney, and Timothy E. Moran, Assistant United States Attorney,

21  and hereby submits its memorandum regarding the sentencing of defendant Eric John Tudela Mafnas.

22  The Government does not object to the factual findings in the Presentence Investigation Report ("PSR").

23  Due to the unusual circumstances of this case, that neither the sentencing judge nor the Probation Office

24  was able to be present throughout the two week trial in this case, the Government submits this

25  memorandum to supplement the facts as reported in the PSR.  In addition, the Government intends to

    move at sentencing for the Court to adopt the Guidelines level in the PSR, plus (i) an additional two

level enhancement (for a total of four levels) for Mafnas's leadership role and (ii) a two level

enhancement for Mafnas's possession of a firearm during the drug crime. The Government submits this

memorandum in support of those motions as well.

I.     RELEVANT DRUG CONDUCT

The jury convicted Mafnas on all counts of the indictment, including conspiracy to commit

theft, perjury and to make false statements, 18 U.S.C. § 371; theft concerning programs receiving federal

funds, 18 U.S.C. § 666; conspiracy to distribute and possess with intent to distribute a controlled

substance; 21 U.S.C. §§ 846, 841(b)(1)(B); possession with intent to distribute a controlled substance;

21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B); false statements, 18 U.S.C. § 1001; and perjury, 18 U.S.C. §

1623. Although Mafnas's theft and distribution of the Chizuwa ice was his most prominent drug

conduct (and accounts for most of the weight attributable to him), the evidence at trial also showed that

Mafnas was involved in stealing and dealing drug evidence long before he stole the Chizuwa ice.

Carl Cabrera testified that Mafnas first brought him three plates of ice to sell in June or July of

2002, almost a year before he stole the Chizuwa ice. [RT 18-19, 31].[1] Later on, Mafnas repeatedly

asked Cabrera to test drugs for him, presumably drugs that he had confiscated and intended to sell. [RT

33]. On another occasion, Cabrera saw Mafnas pocket one of the plates of ice purchased by him in a

controlled buy. [RT 112-13]. Finally, Mafnas asked Cabrera to divide one of his controlled buys into

two packages because Mafnas needed to replace drug evidence from a previous buy. [RT 162-63]. All

this occurred *before* Mafnas stole the Chizuwa ice, although he had already planned to have the Chizuwa

ice brought back from Guam so that he could steal and sell it. [RT 36-37].

There was other evidence of Mafnas's drug conduct from before the theft of the Chizuwa ice.

Government exhibits 5 through 8 are all drug evidence envelopes from which Mafnas stole the contents.

---

[1]Reporter's Transcript of the Cabrera's testimony is abbreviated "RT;" Government's Exhibit is abbreviated "GX;" and Defense Exhibit is abbreviated "DX." Cited pages of the transcript are attached to this memorandum. Only the transcript of Cabrera's testimony is currently available.

1   Government exhibits 5A through 8A document the corresponding controlled buys which resulted in drug

2   evidence of which Mafnas took possession. In fact, Cabrera himself (codenamed "Jake") performed two

3   of these controlled buys. [GX 5,6; RT 63]. However, as demonstrated at trial, none of the four

4   envelopes contained the drugs that they should have – because Mafnas stole them.

5          Of course, Mafnas conducted all of this drug activity as a prelude to his theft and distribution of

6   the 46 grams of Chizuwa ice. Cabrera testified regarding 12 times that he received drugs from Mafnas,

7   usually .6 grams at a time. [RT 120-24, 232-33]. In addition, Mafnas told Cabrera that he had at least

8   one other person to sell for him, [RT 116]; and his brother Frankie Mafnas confessed to selling drugs for

9   Mafnas. [RT167-68]. Mafnas continued his drug activity even after the Chizuwa ice ran out, giving

10  Cabrera fake ice, or *tawas*, for him to sell on at least one occasion. [RT 259-60].

11  II.     SENTENCING GUIDELINES DISCUSSION

12          A.     Leadership Role

13         The PSR applied a two level enhancement for Mafnas leadership role in directing two or more

14  criminal participants, pursuant to U.S.S.G. § 3B1.1(b). See PSR ¶ 86. Paragraph (a) of the same section

15  provides for a four level enhancement for an organizer or leader of criminal activity that involved five or

16  more participants. Paragraph (a) should apply because Mafnas supervised the activities of at least five

17  people: Charley Patris, the co-defendant; Carl Cabrera, a convicted co-conspirator; Frankie Mafnas, his

18  brother, who was an unindicted co-conspirator, [RT 167]; Steven Abal, a convicted co-conspirator, who

19  purchased the Chizuwa ice from Cabrera, [RT 170]; and Andrew Taimanao, Frank Quitugua, and David

20  Hosono, CNMI DPS and Customs officers who were supervised by Mafnas in the Special Investigative

21  Section ("SIS"). It does not matter for the purposes of U.S.S.G. § 3B1.1 that Frankie Mafnas, Taimano,

22  Quitugua and Hosono were not convicted because "a participant is a person who is criminally

23  responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1,

24  comment. (n. 1). The evidence at trial demonstrated that all carried out criminal activity at Mafnas's

25  direction. All three participated in Mafnas's scheme to create and execute a fake arrest warrant for

1    Frankie Mafnas, who was selling drugs for Mafnas, to insulate him from DEA investigation. In

2    addition, Frank Quitugua also falsified a report at Mafnas's request to hide Mafnas's theft of

3    approximately $3,000 from a Chinese drug dealer. [DX Q]. In fact, each of the officers testified at the

4    trial pursuant to non-prosecution agreements with the Government, which referenced their criminal

5    culpability. [DX A, B, and C]. See United States v. Hanousek, 176 F.3d 1116, 1125 (9th Cir. 1999)

6    (upholding supervisory role even though the person that the defendant supervised was not prosecuted);

7    United States v. Atkinson, 966 F.2d 1270, 1276 (9th Cir. 1992).

8              B.    Mafnas's Possession of a Firearm

9          Sentencing Guidelines Section 2D1.1(b)(1) provides that possession of a dangerous weapon

10   (including a firearm) during drug conduct results in a two level increase. The Government intends to

11   submit evidence at the sentencing hearing that it was DPS policy for an SIS detective to carry a firearm

12   during all working hours. Cabrera testified that Mafnas conducted most of his deals with Cabrera during

13   the day. [RT 131]. In addition, Mafnas stole drugs both from completed controlled buys and from the

14   evidence room while on duty; conducted his drug deals from his government issued car: first a black

15   Toyota Camry, [RT114, 118, 156], and then a white Ford Expedition, [RT 156, 260; GX 10]; and even

16   attempted to collect drug money in his government car with Patris along. [RT 155].

17         These facts, that Mafnas committed drug crimes while on duty and that DPS had a policy for him

18   to carry a firearm during that time, are sufficient for a finding that Mafnas possessed a firearm in the

19   course of his drug conduct within the meaning of § 2D1.1(b)(1). See United States v. Partida, 385 F.3d

20   546, 563 (5th Cir. 2004) (evidence that police officer engaged in drug conduct while on duty and of a

21   department policy requiring officers to carry firearm provided sufficient facts for weapon possession

22   enhancement).

23   III.    CONCLUSION

24         In conclusion, the Government intends to move this Court at the sentencing hearing to:

25         1.    Adopt the Sentencing Guidelines analysis in the PSR, with the following additions;

2.   Adopt an additional two level enhancement (for a total of four levels) for Mafnas's leadership role in the offense pursuant to U.S.S.G. § 3B1.1(a); and

3.   Adopt an additional two level enhancement for Mafnas's possession of a firearm during the offense pursuant to U.S.S.G. § 2D1.1(b)(1).

Accordingly, the Government respectfully requests that the Court find that the applicable Sentencing Guidelines level is 40 (recommended sentencing range of 292 to 365 months).  The Government reserves the opportunity to address the Court with regard to its specific recommendation at the hearing.

Dated: February __7__, 2006
Saipan, CNMI

Respectfully submitted,

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and the NMI

By:      _____
TIMOTHY E. MORAN
Assistant United States Attorney

CERTIFICATE OF SERVICE

I, Timothy E. Moran, attorney to the plaintiff United States of America, hereby certify that, on February 7, 2006, I caused a copy of the foregoing Government's Memorandum Regarding Sentencing to be served by Federal Express overnight delivery, upon the following attorney for the defendant:

Howard G. Trapp, Esq.
200 Saylor Building
139 East Chalan Santo Pappa
Hagatna, Guam 96910.

_____
TIMOTHY E. MORAN
Assistant United States Attorney

1   that very time?

2   A    No.

3   Q    You don't know or he wasn't?

4   A    I don't know.

5   Q    All right.  Fair enough.  So he's in this car and where were you

6

7   when this happened?

8   A    I was inside my dad's house.

9   Q    And what village was that?

10  A    Sadog Tasi.

11  Q    Now earlier on you mentioned like around June or July of '02,

12

13  you were in Reyes Apartments.  Was this event we're talking about

14  here before you lived at the Reyes Apartments or after?

15  A    (No response.)

16  Q    Where did you live, at Reyes Apartments, or your dad's, first?

17  A    Reyes Apartment.

18  Q    Okay.  So sometime you left the Reyes Apartments and then moved

19

20  in with your dad because of the restraining order, right?

21  A    That's correct.

22  Q    All right, now I'm caught up.  Let's talk about what happened

23  there in the car, in the unmarked police car.  Three plates of ice,

24  do you know where he got it?

25  A    No.

Q    Did he tell you anything about where it came from?

A    No.

Q    Well, for those of us who might think it's sort of strange that a policeman would give somebody, like, three plates of ice; you've got to help us out. Can you explain how this came about, that all of a sudden you get this stuff?

A    When we were talking, he told me to sell the two plates of ice. He needs the $100 and the last plate, I could keep it to myself.

Q    So you got three plates, right?

A    That's correct.

Q    And you were supposed to sell two of them.

A    That's correct.

Q    And you can keep the third one for yourself.

A    That's correct.

Q    Well, did you do that?

A    Yes, I did.

Q    Now thinking back on that time, do you have a clear recollection in your mind of that happening? Do you remember it?

A    Yes.

Q    Well, do you remember anything about how this defendant over there, Eric Mafnas, had the drugs, the three plates when he first gave them to you?

1   at your dad's house when Eric Mafnas gave those to you, can you tell

2   us what led up to that?

3   A   Uh, he told me that he needs the $100 to, for his kids.

4   Q   All right.  Then what?

5   A   I could have the last plate.

6

7   Q   Is that the first time he ever gave you drugs like that?

8   A   Yes.

9   Q   Was it the last time?

10  A   No.

11  Q   Well, okay.  So he gives you these three plates.  Do you have

12  any idea of when that was, what year, what time of year?

13

14              MR. INOS:  Objection.  Asked and answered.

15              MR. BOWERS:  I don't recall it, but --

16              THE COURT:  Overruled.

17              MR. BOWERS:  -- sorry if it was.

18

19  Q   I'm trying to establish the time line if I can, Mr. Cabrera.

20  Can you tell this jury about when it was that you moved into your

21  dad's place?

22  A   In about 2002.

23  Q   Okay.  It's a while ago and I don't expect you to know the date

24  or the day, but do you have any idea what, what months it was, what

25  range, perhaps?

33

A    Yes.

Q    When was the next time?

A    Uh, when I moved back to Reyes Apartment with my wife.

Q    Okay.  Patched things up?

A    Yes.

Q    Okay, and what happened then?

A    He would often comes and show me drugs.

Q    Who are you talking about?  Who would often come?

A    Eric.

Q    This defendant here, right?

A    That's correct.

Q    He showed you drugs.  Tell us about that.  Explain it to the jury so they know what you're talking about.

A    Uh, he comes by often to Reyes Apartment.  He will show me drugs, and he would ask me if I could check the drugs if it's real or fake.

Q    Now for those of us who don't understand this, you're not a chemist, are you?

A    No.

Q    Or some kind of a technical expert on chemistry of drugs, right?

A    Right.

Q    How would you test to see if the drugs that he showed you were

36

Q    Tell us, where were you working at the time?

A    At that time I was working at K.P. Company.

Q    For those who don't know, what kind of work did you do there?

A    Uh, operating heavy equipment.

Q    Tractors?

A    Dump trucks, pay loaders.

Q    So Eric Mafnas came to your place of work to have you do this?

A    Yes.

Q    How many of the four times or so did he do that?

A    I do not remember.

Q    Do you remember any other places where you met to taste test the drugs?

A    At my house, the entrance of my house.

Q    Okay, well, besides the three-plate deal, that he gave you three plates and you sold two of them, and besides these times where he asked you to taste test drugs, were there other occasions when he talked to you about drugs, that were unconnected with your work as a confidential informant?

A    Yes.

Q    Tell us about that.

A    He had told me that they got a drug that's been seized, but it's over in Guam, and he would try to find a way to bring the drugs from

Guam Laboratory.

Q    He told you this.

A    Yes.

Q    Explain to these jurors how that happened.  I mean, did he meet you and just say, "hey, guess, what?"  Or did you ask him?  We want to know how, how that conversation started, and how it happened that he told you this information?  Can you help us out there?

A    We were sitting in a car, his car.

Q    Which one?

A    That black Toyota Camery.

Q    Okay.

A    I do remember when he started telling me that -- after he told me that the drugs from Guam, about months later, I'll say, he told me that he's preparing the travel documents for Jun Taimanao to go and retrieve the drugs of Chizuwa, Manabu.

Q    All right, did he actually use the name Jun Taimanao, say, "I'm preparing documents for Jun Taimanao."?  Did he actually say that to you?

A    Yes.

Q    Do you know Jun Taimanao?

A    No.

Q    When he said the name, did it mean anything to you at all?

1  THE COURT:  You know, which can't be varied without them

2  bringing the bracelet in, I guess.  Now I don't know how it's

3  possible to do that, except perhaps to give a wide margin.  What's,

4  you know, ordinarily -- let me ask both defense counsel.  How much

5  time do you need after the trial day to confer with your clients?

6  MR. INOS: We'll say, Your Honor, about --

7

8  THE COURT: Couple hours?

9  MR. INOS: It did vary so up to 12:00 o'clock midnight.

10  THE COURT: What?  It varies but what?

11  MR. INOS: It varies on days and definitely, I don't want to

12  suggest that --

13

14  THE COURT: Well, what's the, what's a usual?  What do you

15  usually need, let me put it that way, an hour, two hours?  What do

16  you usually need?

17  MR. INOS: Two hours, three hours, Your Honor.

18  THE COURT: Ms. Flores, does that sound about right to you?

19

20  MS. FLORES: That sounds about right, Your Honor, two to

21  three hours, usually.  However, it's just -- it's hard to tell based

22  on what comes out during the course of the day.

23  THE COURT: I know, that's what I just said; that's why I

24  said "usually." You know, I'm not -- I don't mean it as an iron bound

25  rule.  Is there -- let me ask the probation officer.  Is there some

A    Behind Eric.

Q    All right, and you pulled this one out of your pocket, and then what?

A    And when I pulled it out I kind of hide it away from Patris.

Q    Why did you do that?

A    I was scared at that moment I'll be in trouble.

Q    But you didn't hide it from Eric, right?

A    That's correct.

Q    Why?

A    I don't know.  I don't know why.  I just took it out to -- I took it out and see if he will stop getting mad.

Q    Did he?

A    Yes.

Q    Tell us, tell this jury what Eric Mafnas did when you handed him that fourth plate.

A    He was looking at me trying to give me a signal, and the way I looked at that signal, it's like to hold it back.

Q    Did he make a signal?  Did he do something?

A    Yes.

Q    What did he do?

A    He was kind of nodding his head.

Q    Okay, for the record here, you're just kind of nodding your head

slightly.  Is that what he did?

A    Yeah, something like going forward.

Q    Okay, then what happened?

A    And then he said, "never mind." They will just go with what I

gave him.

Q    What did he do with that fourth plate that you gave him?

A    When I hand it over to his right hand, I was side-glancing his

hand and he slid it in his pocket, right pocket.

Q    He put the fourth plate that you were sneaking into his own

pocket?

A    Yes.

Q    Where were the other three plates?

A    Uh, in his other hand.

Q    Do you know what he did with those?

A    Uh, as I remember, he stuck it the in ash tray of the car.

Q    What was Charley Patris doing when this was going on?

A    At that time, I do remember about the monitoring device, that

was like a luggage thing that was --

            THE REPORTER: It was what?  Luggage what?

            THE WITNESS: Luggage like a hand-carry thing.  I do

remember him, he's like working on something on that luggage thing

control.

Q    So he was working on something back --

A    Yes.

Q    -- in the back seat there?

A    Yes.

Q    Yesterday when we left off, I kind of hurried you through to a certain spot where you talked about Eric Mafnas saying that he was waiting for drugs to come back from Guam.  Remember that?

A    Yes.

Q    And then over a month later, he shows you this container, actually a couple of different containers, right?

A    That's correct.

Q    But let's talk about that large container.  When he handed it out and he was showing you what was inside of it.  What was inside of it, again?

A    Uh, ice.

Q    And when he showed you that, where were you at, again?

A    Inside the black Toyota Camery.

Q    And where was the, where was the Toyota Camery located, what part of town?

A    At my job site.

Q    And which job was that?

A    That's, uh, down in, uh, going down to Tanapag Cemetery.

116

MR. BOWERS: Take your best chance. (directing)

Q    She's got to work in English, too, and if she doesn't know the spelling, she'll just take it down as best she can.  That's what we're talking about.  Okay?  I tell you what.  What I'd like you to do is tell us what happened next then.  After this decision you made to sell drugs for Eric, did you call him up and say, "okay, I'll do it;" or how did it go?

A    Uh, before I did, before I call him up and tell him that I agree, I do remember him telling me that if I don't want, if I don't want to, he's got other person that could do it.

Q    So what happened?

A    When, uh, I had a buyer, I couldn't find the Chinese guy that I just mentioned.  So I decided to call him up.

Q    Who was your buyer at the time, do you remember?

A    I do not remember.

Q    But you had some buyer.

A    Yes.

Q    Okay.  Tell us what happened next.

A    So I called up Mr. Mafnas.  He was not answering his phone, so I paged him up.

Q    You had his Pager number, huh?

A    Yes.

1    A    Yes.

2    Q    Well, what happened?

3    A    He did, uh, respond to that because, uh, he stopped by at the

4    place that I was living.

5    Q    And what place was that?

6    A    That was in Reyes Apartment, I believe -- uh, San Vicente.  I'm

7    sorry.

8

9    Q    Tell us what happened.  When he came there, was he by himself?

10   A    Yes.

11   Q    Was he driving a vehicle?

12   A    Yes.

13   Q    Which one?

14

15   A    That time, the Camery.

16   Q    Tell us what happened.

17   A    Uh, when he came, I gave him the $450.  And that was, I believe,

18   the first time that pack was going to be open.

19

20   Q    What do you mean?

21   A    The container that I saw, he showed me.

22   Q    That's the first time you saw him actually open it up?

23   A    That's correct.

24   Q    I see.  Well, tell us what happened then.

25   A    Uh, when he was opening that container, I do remember him

1   and that scale has a small -- how should I say -- a cup. At first he

2   was trying to figure out -- me and him were trying to figure out the

3   amount that, I mean, the number that says on the, the scale, 'cause

4   there were numbers that says, ".1, .2 up to .5," so we're trying to

5   figure out which one is the one gram and the half gram.

6
7   Q    Did you figure it out?

8   A    Yes.

9   Q    And so what happened next after you guys figured that out?

10  A    I figured it out.

11  Q    You did.

12
13  A    Yes.

14  Q    So what happened?

15  A    Well, when he removed that tape from that cover, starts tapping

16  down, down to, I want to say, a cup for the scale. And that, uh, the

17  weight of the ice lift up the rear of the scale until it reached .5

18
19  on the scale. But as it reached the, the .5 on the scale, it

20  wouldn't go up because that was the capacity of that scale.  He saw

21  that -- I told him that it's already .5, but he keeps tapping it and

22  it goes a little extra.

23  Q    So a little more than .5.

24  A    Yes.

25  Q    Okay.  What happened next?

121

A    Then he pulled out a small Ziploc from the same container where

he pulled out the scale.   Take out the cup of the scale and pour it

into the Ziploc.

THE REPORTER: Pour it or put it?

THE WITNESS: Pouring it.

Q    BY MR. BOWERS: What happened next?

A    Uh, I give him the money and I took what I bought.

Q    Where did you get the money, Mr. Cabrera?

A    From the person that was, that wanted to buy.

Q    So it wasn't your own money.

A    No.

Q    Now I want to make sure I understand this.   Yesterday when we

broke, you talked about the fact that Eric Mafnas had brought this

plastic container that you said had the Chizuwa ice, the stuff that

came from Guam.   Remember that?

A    Yes.

Q    Is that the same ice that we're talking about here or is it

different ice?

A    It was the same one.

Q    Okay.   Well, tell us, how did you leave it that day?   Did he

give you those Ziploc?

A    Come again?

Q    He gave you the Ziploc; you gave him the money, right?

A    That's correct.

Q    What did you do with the Ziploc bag then?

A    Uh, I took the Ziploc and I had to smoke some first.

Q    All right, then what?

A    And the first smoke, I don't feel anything, so I decided to keep putting more.

Q    And this was how you figured it out it was not that great?

A    Yes.

Q    It's poor quality?

A    Yes.

Q    Were there other occasions then, -- well, let me, let me ask this.  Did you return, did you return to the same situation and get more drugs from Eric Mafnas?

A    I don't understand that.

Q    Yeah.  Were there other times when you did the same thing?

A    Yes.

Q    Got more drugs from Eric Mafnas.

A    Yes.

Q    All right.  You and I have talked about this a little bit, too, right?

A    Yes.

Q    And we, and I asked you and we will do this again.  When we talk about numbers of times and amounts of drugs, and that type of thing, what I want you to do is to be conservative.  I want you to be as accurate as you can.  Can you do that?

A    Okay.

Q    Let's say we talk about numbers of times you've met with someone and you say, you know, "I'm positive about five times but it could have been more, but I know for sure about five." Can you talk about only the ones that you're sure of?

A    Okay.

Q    All right, the same with drug weights, that type of thing.  Can you do that?

A    Okay.

Q    I know that, you know, this is a long time ago, but I want you to be as accurate as you can.  Can you do that?

A    Okay.

Q    All right.  How many times under that kind of operation here, under that idea, how many times did you meet with Eric Mafnas here when he gave you drugs to sell to other people after that first time?

A    Uh, 11 more times.

Q    Eleven more.

A    Yes.

Q    Could it have been more?

A    Yes.

Q    But you're sure about 11 more times.

A    Yes.

Q    So 12 in all that you're rock solid sure of?

A    Yes.

Q    All right.  Just so we understand, that first time you brought the money first and you met him in the car, and that was at what location?

A    At my job site.

Q    Okay.  But inside of his car is where it was, right?

A    That's correct.

Q    Tell this jury what other locations you met him at where he gave you drugs.

A    Uh, I remember water tank up in Papago.

Q    Well, let me stop you there and let me show you some pictures, perhaps.  I'm going to show you what's been marked as No. 11.  It's a photograph.  Do you recognize the scene in this picture?  Excuse me. This is No. 12, No. 12.  Do you recognize the scene there?

A    Yes.

Q    Is that the location you're talking about, this water tank in Papago?

Q    So, so far the areas you talked about then are the Super Blue

Tank, then on the beach someplace south of the PIC, and then on the

beach north of the PIC between PIC and what?

A    Uh, San Antonio Elementary School.

Q    So in that stretch of beach on that spot, right?

A    That's correct.

Q    When you met on these locations, was it, was it always a

particular time of day, or did it vary?

A    Uh, it's mostly daytime.

Q    What else, were there any other places where -- I didn't ask you

this.  How many times did you meet on that stretch of beach between

PIC and the school?

A    I do remember two times.

Q    Any other places that you met besides inside the car.  I mean,

I'm talking about locations.

A    His house.

Q    I'll show you a couple of pictures, 13 and 13A.  Do you

recognize the scenes in those pictures?

A    Yes.

Q    What's 13, first of all?

A    That's, uh, where he lives.

Q    Mr. Mafnas?

1    Q    Did you learn that there was somebody inside?

2    A    Uh, no, not at the time.

3    Q    Okay.  Well, were there any times when you did in fact find out

4    that, hey, somebody else was along?

5    A    Uh, I don't understand that.

6
7    Q    Were there times when Eric would come and you know, "hey,

8    there's somebody else with him"?

9    A    Yeah.

10   Q    Okay, who?

11   A    Uh, I do remember one time he was with Charley Patris.

12
13   Q    Tell us about that time.

14   A    I was leaving the house in San Vicente, uh, heading up to a

15   store named CYA Store.

16   Q    The CYA Store is on the east side of the island, right?

17   A    The San Vicente area.

18
19   Q    What's near by that, for those who might not know?

20   A    San Vicente School.

21   Q    Okay.  Tell us what happened.

22   A    Uh, I remember this morning, early morning when I was heading to

23   the store, I saw, uh, his, uh, I'll say, his assigned car or

24   undercover car, Ford Expedition, going down the direction I'm coming

25   up.  And when I saw that car, I was already in advance of what to

tell him.

Q    What do you mean by that?

A    I know he was coming over to collect money from me.

Q    Did you have money to give him at that time?

A    No.

Q    Why not?

A    'Cause I think I end up, I'll say, misdeal, misdealing smokes
I've taken.

Q    I'm not sure I understand.  Had you finished selling the drugs
yet?

A    Uh, yeah.

Q    Okay, but you didn't have any money to give him?

A    No.

Q    You talked about a couple of different vehicles, but you
mentioned an Expedition, you say?

A    Yes.

Q    Uh, was it a police vehicle?

A    Uh, there's no logo on it but I know it's a police vehicle.

Q    How do you know that, Mr. Cabrera?

A    'Cause the black Camery that he used to drive, I remember we
were working on it one early morning 'cause it overheated and he told
me that they were going to replace his assigned vehicle.

162

1  asked me for the drugs.

2  Q    What did you do with them?

3  A    Uh, I believe I handed it over to Mafnas.

4  Q    And did you see what he did with them?

5
6  A    Uh, they were writing this form on the trunk of the black car,

7  the Taurus, and I've seen him showing it to the other two guys.  And

8  then this form they were filling out, I remember the amount.  I

9  believe it was a $100, and then they told me to sign, took the money

10  and just go.

11
12  Q    Is that what you did?

13  A    Yeah.

14  Q    Do you recall any situations where Eric Mafnas told you that he

15  lost the drugs that you had purchased on a previous occasion?

16         MR. INOS: Objection.  Leading.

17         THE COURT: Overruled.

18         THE WITNESS: Come again?

19
20  Q    BY MR. BOWERS: Do you remember any time when Eric Mafnas had

21  told you, "hey, the drugs you bought last time, we lost them; we need

22  to do this again." Remember that?

23  A    Yes.

24  Q    Can you tell this jury what happened on that situation?  First

25  of all, who was involved in that?

163

A    Uh, Victor Reyes.

Q    Okay.  Was it one of the Victor Reyes buys?

A    Yes.

Q    Tell us what happened.

A    I believe that was the third buy --

Q    Okay.

A    -- from Victor Reyes.

Q    Tell us the story.  What happened there?

A    Uh, before the buy, uh, I met up with Eric, and, uh, he told me that, uh, the first buy that we did on, uh, Victor Reyes, he had lost or misplaced it and he couldn't find it.  Then after that, he told me that, uh, he asked me if I could, if I do a buy from Victor Reyes, and the amount is good if I could take out some and separate it from what am I going to give to them.

Q    He wanted you to take out some of it that you bought and separate it from what you were going to return to the police?

A    That's correct.

Q    Did he tell you why he wanted to do that?

A    Yeah, he told me that, uh, --

Q    What did he say?

A    He lost the buy from Victor Reyes and he wants to replace it.

Q    Did you do that?

1   that, uh, it's good that, uh, these guys are --

2              MS. FLORES: Objection.  Objection, Your Honor.

3              THE REPORTER: I didn't hear what he said.

4              THE COURT: That's okay 'cause there's an objection.

5              MR. BOWERS: It's 801(d)(2)(E), Your Honor.

6

7              MS. FLORES: Yes, Your Honor, and same objection as earlier.

8              THE COURT: All right.  Uh, --

9              MS. FLORES: And it's also been asked and answered.

10             THE COURT: Same ruling.  Objection is overruled.

11

12             MS. FLORES: Thank you.

13             THE COURT: You can start your answer over again 'cause the

14  reporter didn't get it anyway.

15  Q    BY MR. BOWERS: Tell us what Frankie "Kojack" Mafnas, this

16  defendant's brother, told you right there.  He was looking kind of

17  happy and proud and he said what?

18

19  A    And he said it feels good that it's only me and him, uh, have

20  our own source, our own man.  I looked at him and I say, "What do you

21  mean?" "It was my brother." I told him that I'm not getting from his

22  brother.

23  Q    Why did you tell Kojack that you're not getting drugs from his

24  brother?

25  A    'Cause I wasn't supposed to say that.

1   Q   But Kojack tells you, "we both have the same man," his brother.

2   A   That's correct.

3   Q   Now after that conversation that you had with Kojack, did you

4   tell some other people that, that you were in fact getting stuff from

5   Eric Mafnas?  I mean, as time went on, did you tell other people?

6

7   A   Uh, I have never told anybody after that, but I met up a friend

8   of mine.

9   Q   Who is that?

10   A   Steven.

11   Q   What's Steven's last name?

12

13   A   Faisao.

14   Q   Okay.  And does he also go by Abal, too, Steven Faisao Abal?

15   A   I didn't know the Abal until just recently.

16   Q   All right, but you know who we're talking about, right?

17   A   Yes.

18

19   Q   Same guy?

20   A   Yes.

21   Q   Okay.  Tell us what you told Steven Faisao, or Steven Abal, as I

22   might refer to him.

23   A   At the time, Steven's supplier, I'll say, is in jail, and --

24   Q   Did you know -- I want to interrupt you.  Did you know who

25   Steven's supplier was, the one that was in jail?

170

MS. FLORES: Thank you, Your Honor.

MR. BOWERS: May I be heard briefly?  It's an 801(d)(2)(E) made during and in furtherance of the conspiracy.  Abal will be our next witness in this case, Your Honor.

THE COURT: So you're expecting to connect it up?

MR. BOWERS: Yes, sir.

THE COURT: All right, then it's overruled conditionally.

MR. BOWERS: Thank you.

THE COURT: Restate your question.

Q    BY MR. BOWERS: What we'd like to know is what Steven Abal told you, Steven Faisao, same guy, right?

A    Yeah.  Uh, I met up with him that day that, uh, that time at the poker room, you know.  And that's how we get started, you know, to hang around with him again.

Q    Did you start to sell him drugs, the same drugs that you got from Eric Mafnas?

A    Yes.

Q    He was one of your customers, right?

A    Correct.

Q    And at some point in time, did he know, did he find out that the drugs you were giving him came from Mafnas?

A    Uh, I believe he figured it out.

232

A    Come again?

Q    Eric had a gram scale.

A    Half a gram scale, yeah.

Q    Oh, half-gram scale.

A    Yeah.

Q    Oh, oh, okay.  Isn't it true that on direct examination, you said that you and Eric were looking at the scale and you were trying to figure out which is .1, which is .2, which is .5, and which is 1, and that you finally figured it out where the .5 was?  Isn't it true that you said that?

A    I didn't say 1.  I said .1.

Q    Oh, .1.  And you figured out where the .5 was.

A    Yes.

Q    Oh, okay.  So you're the one who knows how to use the scale.

A    I don't know how to use the scale.  I know how to read the numbers.

Q    You know how to read the numbers, but Eric doesn't know how to read the numbers.

A    He knows.

Q    He knows?  But you're the one who figured it out.

A    Yeah.

Q    Right?  Okay.  And so Eric would package this up in Ziploc bags,

1    right?

2    A    Right.

3    Q    Okay.  So he would take a half gram and put it in a Ziploc bag

4    and give it to you, right?  Is that what you're saying?

5    A    I cannot say exactly half because I know he's always giving me

6    .6, a --

7    

8    Q    Oh, .6.

9    A    -- a half gram more.

10   Q    More than, more than half gram.

11   A    Yes.

12   

13   Q    So you know it's about .6.

14   A    Yeah.

15   Q    Okay, 'cause you can tell, right?

16   A    Yeah.

17   Q    Okay.  And that when he doesn't package it for you, he has a

18   scale in the car with the drugs and he puts it on the arm rest and

19   you guys measure it out, right?  That's how it happens, right?

20   

21   A    Right.

22   Q    Okay.  And he takes it out of this plastic container, right?

23   A    Yes.

24   Q    And this is in 2003?

25   A    Right.

A    Yes.

Q    And you said there was an occasion.

A    Yes.

Q    But she didn't ask you a question about when or where and all that stuff.

A    Yes.

Q    Tell this jury what the deal was there.  Can you explain it?

A    Uh, I met a guy and, uh, this guy is, I'll say, a customer of mine, and we were talking and then I mentioned to him about, uh, ice and he asked me if it's a good deal.  I say, "Yes."

        MS. FLORES: Objection, Your Honor.  Anything that someone else said would be hearsay.

        THE COURT: Sustained.

        MS. FLORES: Thank you.

Q    BY MR. BOWERS: Let me ask you a different way.  First of all, did Eric Mafnas, this defendant over here, give you drugs to sell to somebody else that turned out to be fake?

A    Yes.

Q    When was that, before or after you started selling this, these Chizuwa, Manabu Chizuwa drugs for Eric?

A    I believe during.

Q    During the same time?

A    Right.

Q    Right.  Was it different drug, though, different stuff?

A    I believe it's not drug at all.

Q    Oh.  Well, tell us.  What was it?

A    It was "*tawas*."

Q    And for those who don't know, "*tawas*" is what?  What is that stuff?

A    It's a, uh, I think it's a rock salt.

Q    Do people use it to clean like a soap?

A    Yes.

Q    All right.  Well, tell us about that.  And when Eric gave that to you, did he take it out of a package and hand it to you?

A    Uh, a container.

Q    Okay.  And where did this take place?  Do you remember where, where you guys were when Eric turned that over to you to sell?

A    Uh, right below his house in the Expedition.

Q    Now when you, when you sold these drugs to the guy that you mentioned here, did he pay you money?

A    He gave me $250.

Q    Did you bring the money back to Eric?

A    I gave it to him, and he gave me the fake drugs.

Q    Now did the guy complain, the customer, and say, "hey, this was