F I L E D
Clerk
District Court

FEB 2 1 2006

For The Northern Mariana Islands
By_____
(Deputy Clerk)

1  LEONARDO M. RAPADAS
   United States Attorney
2  TIMOTHY E. MORAN
   JAMIE D. BOWERS
3  Assistant U.S. Attorneys
   DISTRICT OF THE NORTHERN
4    MARIANA ISLANDS
   Horiguchi Building, Third Floor
5  P.O. Box 500377
   Saipan, MP  96950
6  Telephone:  (670) 236-2982
   Fax:        (670) 236-2985
7
8  Attorneys for the United States of America
9
                    UNITED STATES DISTRICT COURT
10
                    NORTHERN MARIANA ISLANDS
11
12 UNITED STATES OF AMERICA,        )   Criminal Case No. 04-00038
                                    )
13              Plaintiff,           )   GOVERNMENT'S MEMORANDUM IN
                                    )   RESPONSE TO DEFENDANT'S
14         v.                        )   OBJECTIONS TO THE PRESENTENCE
                                    )   INVESTIGATION REPORT
15 CHARLEY K. PATRIS,               )
                                    )   Date:  February 23, 2006
16                                   )   Time: 1:30 p.m.
                Defendant .         )
17 _____ )
18
19     COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel,
20 Leonardo M. Rapadas, United States Attorney, and Timothy E. Moran, Assistant United States Attorney,
21 and hereby submits its memorandum responding to the objections of defendant Charley K. Patris to the
22 Presentence Investigation Report ("PSR").  The PSR's Guidelines analysis is correct and Defendant's
23 objections are wrong in fact or law.  Accordingly, the Government requests that the Court adopt the
24
25

PSR's factual findings and Guidelines analysis as the findings of the Court and impose a term of imprisonment and fine consistent with the Sentencing Guidelines.[1]

I.   RELEVANT CONDUCT

The jury convicted Patris on three of five counts in the Indictment: false statements, 18 U.S.C. § 1001 (Count Six); perjury, 18 U.S.C. § 1623 (Count Eight); and accessory after the fact, 18 U.S.C. § 3 (Count Nine). Defendant's convictions stem from his role in facilitating and covering up co-defendant's Eric Mafnas's numerous thefts of and conspiracy to sell DPS drug evidence.

In addition to the testimony regarding defendant's role in the false warrant on Frankie Mafnas, which insulated one of Mafnas's key distributors from DEA detection, Carl Cabrera offered the key testimony on defendant's accessory conduct. As Cabrera testified, defendant was present when Mafnas stole drug evidence. [RT 109-11, 161].[2] Also, defendant was present with Mafnas in a DPS vehicle on at least one occasion when Mafnas attempted to collect drug money from Cabrera. [RT 155, 175-76; GX 10]. Finally, and most importantly, defendant instructed Cabrera to lie to DEA and the U.S. Attorney's Office and hide Mafnas's drug conspiracy. [RT 184-85].

In addition, Special Agent Joseph Auther of the FBI testified on February 17, 2006, regarding the extent of the Government's investigation resulting from defendant's perjury and some of the effects on the administration of justice from that perjury. Although there is no transcript from this testimony, it should be fresh in the Court's memory.

---

[1] The Government notes that, even after submitting written objections to the PSR on the morning of the sentencing hearing, defendant has not objected to the factual findings in the PSR.

[2] Reporter's Transcript of the Cabrera's testimony is abbreviated "RT;" Government's Exhibit is abbreviated "GX." Cited pages of the transcript are attached to this memorandum. Only the transcript of Cabrera's testimony is currently available.

2

## II. SENTENCING GUIDELINES DISCUSSION

### A. The Specific Offense Characteristic Of Substantial Interference With Justice and Enhancement For Obstruction Of Justice Are Both Proper.

Defendant objects to the two point enhancement for obstruction under U.S.S.G. § 3C1.1 and the three level specific offense characteristic of substantial interference with justice pursuant to U.S.S.G. § 2J.3(b)(2), which defendant mislabels as an enhancement for perjury. Defendant's conduct includes perjury before the grand jury, which was charged in Count Eight of the indictment, and the resulting investigation and further false testimony before the Court at trial and at the hearing on January 6, 2006. Defendant's total conduct warrants both the specific offense characteristic and the enhancement.[3]

The specific offense characteristic of substantial interference with justice pursuant to U.S.S.G. § 2J1.3 correctly applies to group two (perjury and accessory). A substantial interference with justice includes a "premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." Comment. n. 1. A preponderance of the evidence at trial and from the recent testimony of Agent Auther establishes that felony investigations were terminated because of defendant's conduct, including perjury before the grand jury. The CNMI dismissed its conviction against Manabu Chizuwa, releasing him to the custody of the United States to serve his federal sentence. In addition, Government Exhibits 5 through 8 proved controlled drug buys that were never prosecuted due to Mafnas's thefts, in which the defendant acquiesced. Finally, the CNMI had to abandon all of the criminal investigations on which the defendant worked because of his perjury.

---

[3] Defendant's objection on redundancy grounds is not a valid objection because "there is nothing wrong with 'double counting' when it is necessary to make the defendant's sentence reflect the full extent of the wrongfulness of his conduct." United States v. Reese, 2 F.3d 870, 895 (9th Cir. 1993). Furthermore, there is no double counting anyway, because "the extra punishment is attributable to different aspects of the defendant's criminal conduct." United States v. Haggard, 41 F.3d 1320, 1327 (9th Cir. 1994).

3

Defendant's perjury also caused the Government to expend substantial resources in investigation and prosecution. As Agent Auther testified on February 17, 2006, because of defendant's perjury, the CNMI did not know the fate the 46 grams of methamphetamine, a very large amount in the CNMI. The Government undertook a substantial investigation that included several search warrants, multiple interviews, several criminal indictments, the DEA taking custody of all CNMI drug evidence, a CNMI audit of its evidence room, and ultimately construction of a new evidence room. All of this effort would have been avoided if defendant told the truth about what actually happened to the evidence. The investigation was further complicated by defendant's instructions to a key participant of the conspiracy – Cabrera, who much later cooperated with the Government – to lie to DEA and the U.S. Attorney's Office. Accordingly, the three level specific offense characteristic for substantial interference with justice is necessary to reflect appropriately the harm caused by defendant's conduct. See Haggard, 41 F.3d at 1327.

Next, the two level enhancement for obstruction of justice also applies on multiple grounds. First, it applies because defendant's perjury before the grand jury obstructed justice (pursuant to § 3C1.1) in the same way that it also substantially interfered with justice (pursuant to § 2J1.2). This application applies automatically and does not constitute "double counting." United States v. Merino, 44 F.3d 749, 755 (9th Cir. 1994) (affirming application of three level for substantial interference under § 2J1.2 and two levels for obstruction under § 3C1.1). Furthermore, given the trouble that defendant's blatant lies caused, a total of five levels accurately reflects the harm caused. See United States v. Momeni, 991 F.2d 493, 496 (9th Cir. 1993) (two level enhancement for perjury plus additional upward departure necessary to address seriousness of defendant's perjury). Second, it applies because defendant committed a further perjury at trial, where he affirmed the exact perjury he committed in the grand jury and added further lies under oath, such as his denial that he instructed Cabrera to lie to the Government. This further perjury to the court would separately warrant an enhancement for obstruction of justice, even without an effect on the investigation. § 3C1.1, comment. n. 4; see also United States v. Solano-

4

Godines, 120 F.3d 957, 963 (9th Cir. 1997) ("the application notes distinguish between false statements and documents presented to judges, magistrates, probation officers and pretrial services officers, which need not impede an investigation or prosecution to constitute an obstruction of justice"). Finally, it applies because defendant committed a further perjury in the hearing on January 6, 2006, when he continued to deny his actions in the offenses. Lying after conviction supports an enhancement for obstruction as readily as before conviction. See Merino, 44 F.3d at 755 (post conviction lies to probation officer).

      B.    Role In The Offense Enhancement Is Proper.

Defendant objects to his role in the offense enhancement "in as much as Patris' conduct is based on conduct which occurred after the underlying offense was committed." [sic] (Def.'s Mem. at 2.) It is unclear to what conduct defendant refers. In any event, this enhancement is proper because defendant committed his crimes while a CNMI DPS officer. In fact, Cabrera testified that defendant instructed him to lie about the drug conspiracy while he was on duty as a police officer. In addition, defendant himself admitted that this conversation took place while he was on duty (although defendant lied about the content of the conversation). Accordingly, defendant abused his position of public trust – as a police officer – pursuant to U.S.S.G. § 3B1.3.

      C.    The Base Offense Level of Twenty-Four Is Correct.

Defendant objects to the base offense level of 24 for his accessory after the fact conviction. Pursuant to U.S.S.G. § 2X3.1, the base level for accessory is six levels lower than the underlying offense, which in this case was the conspiracy to distribute at least 46 grams of methamphetamine in the form commonly known as "ice" and the distribution of at least 46 grams of methamphetamine in the form commonly known as "ice." While defendant complains that the jury did not find a specific amount of ice, this complaint is misplaced factually and legally. First, the Court, not the jury, finds the amount of ice by a preponderance of the evidence standard. United States v. Ameline, 409 F.3d 1073, 1077-78 (9th Cir. 2005) (*en banc*). Second, there was ample evidence for the Court to find 46 grams of ice. For

5

example, GX 1 is a lab result for the stolen Chizuwa evidence documenting the 46 grams. Also, the jury specifically found that Counts Three and Four involved ice, not any less pure substance. Accordingly, the base offense level of 24 for accessory to a conspiracy to distribute 46 grams of ice is correct.

D. <u>Defendant Is Not Entitled To An Adjustment For Acceptance Of Responsibility.</u>

Defendant asserts that he was denied an adjustment for acceptance of responsibility because he refused to discuss the offense with the probation officer. Defendant is not entitled to credit for acceptance of responsibility because he has not accepted responsibility and put the Government to its burden of proof at trial. U.S.S.G. 3E1.1, comment. n. 2. More recently, on January 6, 2006, he again testified under oath and again denied his crimes. Accordingly, defendant's refusal to discuss the criminal conduct with the Probation Officer is irrelevant, as defendant has not shown any acceptance of responsibility in any other aspect of his conduct.

E. <u>Separate Grouping Is Irrelevant.</u>

Defendant objects to grouping the false statements separately from perjury and accessory after the fact. The offense level for group one is 10; the offense level for group two is 31. As group one is more than nine levels less serious than group two, it has no effect on the combined total offense level pursuant to U.S.S.G. § 3D1.4. Accordingly, even crediting defendant's argument, it would have no effect on the offense level for which he will be sentenced.

III. THE GOVERNMENT REQUESTS A FINE PURSUANT TO U.S.S.G. § 5E1.2(c)(3).

At sentencing, the Government intends to request a $50,000 fine pursuant to U.S.S.G. § 5E1.2(c)(3).[4] The PSR, as amended on February 17, 2006, indicates that defendant will have an income from his CNMI pension of $746.32 monthly, without taking into account the greater monthly amount that defendant would receive if he made a one time additional payment. Defendant will make money for every day that he spends in prison and this income will leave the defendant's family with a positive

---

[4] The maximum fine under 18 U.S.C. § 3 and 21 U.S.C. § 841(b)(1)(B) is $1,000,000.

6

monthly cash flow of $1,129.66. The Court should impose a fine consistent with the Sentencing Guidelines on this anticipated income. See Haggard, 41 F.3d at 1329 (court may fine a defendant, even where presently indigent, if court finds that defendant will have earning capacity in the future to pay the fine). Over the course of defendant's anticipated prison sentence, he will earn approximately double the amount requested by the Government.

IV. CONCLUSION

In conclusion, the Government moves this Court at the sentencing hearing to:

1. Adopt the Sentencing Guidelines analysis in the PSR of Level 31;

2. Impose a fine consistent with the Sentencing Guidelines of $50,000; and

3. Impose a term of imprisonment consistent with the Sentencing Guidelines.

The Government reserves the right to address the Court with its specific recommendation regarding the term of imprisonment at sentencing.

Dated: February 21, 2006
Saipan, CNMI

Respectfully submitted,

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and the NMI

By: _____
TIMOTHY E. MORAN
Assistant United States Attorney

| | | |
|---|---|---|
| 1 | Q | Where was that? |
| 2 | A | That was the house behind Hakubotan. As I was walking, I |
| 3 | | decided to hide one plate. |
| 4 | Q | So one of the four, you hid it? |
| 5 | A | Yes. |
| 6 | Q | Why? |
| 7 | | |
| 8 | A | For my, to take it for my own. |
| 9 | Q | So you were going to cheat Mafnas and Patris here and just give |
| 10 | | them three out of the four? |
| 11 | A | Yes. |
| 12 | Q | Well, tell us what happened. |
| 13 | | |
| 14 | A | When I walked back to the place that we met, I got in the car. |
| 15 | Q | The Taurus? |
| 16 | A | Yes. |
| 17 | Q | Okay. Who was in the car then? |
| 18 | A | Mr. Mafnas and Patris. |
| 19 | | |
| 20 | Q | Tell us where they were sitting. |
| 21 | A | Mr. Mafnas was driving and Patris was sitting in the back. |
| 22 | Q | Nobody in the front passenger seat? |
| 23 | A | No. |
| 24 | Q | Okay, then what happened? |
| 25 | A | Then I took out the three plates and I gave it to Mafnas. |

Q    When you gave those three plates to Mafnas here, what did he say, if anything?

A    He say, in Chamorro he say something like "only", you know, "a little; *laña*" and then "only this?" I said, "yeah."

Q    Now let me stop you for a second. I know what "*laña*" means, okay? because I've been here a little while. But for this court, we can only speak English. That's the way the rules of the court are, all right?

A    Okay.

Q    So I need to have you do the best you can and explain this. When you're talking to these fellows, Mafnas and Patris, was it always in Chamorro?

A    Yes.

Q    Maybe a little English here and there but mostly in Chamorro. Would that be fair?

A    Yeah.

Q    Okay. And likewise, when you're talking to fellows that you were buying from, was that mostly in Chamorro, too?

A    Yes.

Q    All right. But for this, for here, you've got to talk about what happened in English. And so bear with us. Can you please tell us in English what, what Eric Mafnas said when you came back with the

drugs?

A   Uh, he's kind of upset and he goes, "this is what you get for 150?" I said, "Yes." And then he goes, "it's not worth it; take, take this back and return it and get the money back."

Q   So he says, "three plates isn't enough for a 150; take this back and get your money back."?

A   Yes.

Q   Then what happened?

A   Uh, I was sitting down thinking if I should take out the other plate or I wouldn't. Uhh, I gave up and took out the other plate.

Q   You took it out of your pocket, or where was it?

A   It was in my pocket.

Q   Okay. Now, Mr. Cabrera, as you were doing this, were the doors of the car shut?

A   Yes.

Q   You're inside this Taurus car.

A   Yes.

Q   And you're in the front passenger's seat, right?

A   That's correct.

Q   Eric Mafnas is in the driver's seat?

A   That's correct.

Q   And Patris is in the back, right behind you or behind Eric?

Q   Did you learn that there was somebody inside?

A   Uh, no, not at the time.

Q   Okay. Well, were there any times when you did in fact find out that, hey, somebody else was along?

A   Uh, I don't understand that.

Q   Were there times when Eric would come and you know, "hey, there's somebody else with him"?

A   Yeah.

Q   Okay, who?

A   Uh, I do remember one time he was with Charley Patris.

Q   Tell us about that time.

A   I was leaving the house in San Vicente, uh, heading up to a store named CYA Store.

Q   The CYA Store is on the east side of the island, right?

A   The San Vicente area.

Q   What's near by that, for those who might not know?

A   San Vicente School.

Q   Okay. Tell us what happened.

A   Uh, I remember this morning, early morning when I was heading to the store, I saw, uh, his, uh, I'll say, his assigned car or undercover car, Ford Expedition, going down the direction I'm coming up. And when I saw that car, I was already in advance of what to

informant.  Okay?  And we talked about one buy from Victor Reyes, right?

A    That's correct.

Q    But there, were there more than one?

A    Yes.

Q    Tell us why, if you know, there were more than one.

A    'Cause I remember our first buy that we had to meet (unintelligible word) Road.  And the second buy, I brought Mr. Patris with me, on passenger.  And there's another buy after that.

Q    So how many in all?

A    Three.

Q    Three.  Do you know what happened to the drugs after you brought them back to the officers in those three buys?

A    I do remember the first time I went there, I did a buy.

Q    Okay.

A    And after I did that buy, they tell me that we'll meet in the same place where we met the first time.  When I got there, uh, the three officers are there.

Q    Who are they?

A    Uh, Eric, Patris, and Andrew Taimanao.

Q    Tell us what happened.

A    I, when I got down, they retrieved the recording device and they

1  THE WITNESS: A distance.

2  Q    BY MR. BOWERS: What do you mean by that?

3  A    'Cause I've upfront some drugs for him and I haven't paid him
4  back yet, the amount that I took, not all of it.

5  Q    Do you still owe him money as you sit here today?

6  A    Yes.

7

8  Q    You still owe him some.

9  A    Yes.

10 Q    How much do you owe him?

11 A    Uh, I'll say, over $1000.00.

12 Q    My partner just slipped me a note. I forgot to ask you
13 something, so let me do this. Remember you mentioned the CYA Store?

14

15 A    Yes.

16 Q    A store over in the east side of the island?

17 A    Yes.

18 Q    Uh, do you remember an occasion there when, when you met Eric to
19 pay money?

20

21 A    Yeah, that was morning when I was driving out.

22 Q    Okay. Who was with Eric at that time?

23 A    Uh, Patris.

24 Q    Can you tell this jury what happened there?

25 A    Uh, when we stopped on the road, uh, the driver, driver side

176

    window open up --

Q    Yes.

A    And, uh --

Q    Who was on the driver side?

A    Patris.

Q    What vehicle are we talking about?

A    Expedition.

Q    A big white one?

A    Yes.

Q    All right.

A    And then Eric asked me where Am I going.  I told him I'm going up to the store.

Q    What happened next?

A    Uh, I told him that I'll met him up there at the store.

Q    For what?

A    For payment still exist.

Q    Who was paying whom money?

A    Uh, me, pay Eric.

Q    You were supposed to pay Eric for what?

A    For the ice.

Q    Now when you had this conversation with Eric, was Eric still in the Expedition, or did he get down and talk to you in your car?

A   Uh, I remember meeting him in a store in San Jose.

Q   What store?

A   I'm not really sure. I believe it's a San Jose Market.

Q   Where is it located?

A   It's located right in front of San Jose church, the entrance of San Jose church.

Q   Uh, tell us, tell us what happened there.

A   Uh, when I pulled in to that store, uh, I got down from my car, walking into the store and then we met while I was walking into the store and I told him that I got picked up by the DEA, brought to the U.S. Attorney's Office for questioning.

Q   You told him that?

A   Yes.

Q   Now was there anybody with Charley Patris on that day?

A   Uh, yes, he was with somebody.

Q   Standing next to him?

A   No.

Q   What do you mean by somebody with him?

A   Uh, there was a patrol car.

Q   Do you know who was in it?

A   I do not remember who was it.

Q   Okay. Well, tell us -- you told him all that stuff. What did

he say to you?

A   I told him that I got questioned by U.S. Attorney. And I told him that I didn't say anything. I told them, "I don't know anything."

Q   What did he tell you?

A   He goes, "yeah, the next time they pick you up again, just tell them that you don't know anything."

Q   Did he say anything else to you?

A   And that time, no, that's about it.

Q   He just said that, "if you're picked up again, tell them, you don't anything."?

A   Yes.

Q   And then what?

A   Then he left. I went into the store.

Q   Had you ever talked to him after that about this case?

A   There were times, but I do not remember what we talked about. But I, every time I met up with him or Eric, I always bring that up.

Q   Well, tell this jury why, why would you meet him and Eric after that conversation? What caused you to meet with him?

A   Uh, as a friend, I believe.

         MR. BOWERS: I don't have any more questions of this witness, Your Honor.